Mary Lynn BURCH, Plaintiff,

v.

HARTFORD LIFE AND ACCIDENT INSURANCE CO., Defendant.

No. 04–5308.

United States District Court,
W.D. Arkansas,
Fayetteville Division.

June 22, 2005.

---

Conrad T. Odom, for Plaintiff.

Troy A. Price, for Defendant.

### *MEMORANDUM OPINION AND ORDER*

DAWSON, District Judge.

Plaintiff brings this action pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.*, against her disability insurance provider, Hartford Life and Accident Insurance Co. (hereinafter "Hartford"). She seeks total disability benefits from September 1, 2002, and forward as provided under the policy, 12% penalty, reinstatement of her life, medical, and dental insurance, reasonable attorney fees, and prejudgment interest and costs. Plaintiff challenges Defendant's termination of her benefits under her employer's, Wal–Mart Stores, Inc. (hereinafter "Wal–Mart"), group disability insurance policy provided by Defendant (hereinafter "Group Plan").

The matter is before the Court on the Stipulated Administrative Record and the parties' briefs. (Doc. 7–Exhibit A, Doc. 8, Doc. 9.) For the reasons set forth herein, we REVERSE the plan administrator's decision to deny benefits.

### A. Background

Plaintiff began employment with Wal–Mart on October 1, 1998. (AR 358.) Her various jobs at Wal–Mart included Accounting Associate, Customer Service Manager, and Cashier. (AR 358.) Her final job was a cashier in the bakery department. While working as a cashier, she was required to walk and stand regularly, use her hands to scan items and operate a keyboard, and frequently lift or move from 10 to 50 pounds. (AR 602–606.) During her employment, she was included within coverage of Wal–Mart's group disability insurance policy provided by Defendant. The insurance policy included short and long term disability benefits for total disability.

In 1967, Plaintiff, as a child, had a bilateral triple arthrodeses [1] performed. While it is unclear whether it was the right, left, or both ankles were involved, the record seems to indicate that both ankles underwent operations. (AR 353, 476.) A variety of short-term and long-term complications may ensue after a triple arthrodeses procedure. As she grew older, Plaintiff developed osteoarthritis.[2] In June of 2000, Plaintiff was diagnosed with fibromyalgia.[3] Plaintiff sought medical attention from Dr.

---

**1.** "Arthrodeses" is a procedure that fuses three bones in the foot together. The main objective of the triple arthrodeses surgical procedure is to provide lateral stability to the rear foot and to correct any deformity. See *PDR Medical Dictionary 151* (1st ed.1995).

**2.** "Osteoarthritis" is arthritis characterized by "erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with

eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly effects weight-bearing joints." See *PDR Medical Dictionary 1267* (1st ed.1995).

**3.** "Fibromyalgia" is also referred to as "Fibromyositis", which is "chronic inflammation of a muscle with an overgrowth of the connective tissue." See *PDR Medical Dictionary 649* (1st ed.1995);

Angela Ayson, a podiatrist, because of worsening heel pain. Dr. Ayson diagnosed Plaintiff with plantar fasciitis and prescribed pain relievers Celebrex, Darvocet, and Neurontin. (AR 183.)

According to Plaintiff, she had slight improvement by August of 2000 but continued to have pain. (AR 184.) In September of 2000, Plaintiff presented to Dr. Phillip Coker, an orthopedic surgeon. Dr. Coker stated that Plaintiff had anterior ankle difficulties with spurs, and X-rays revealed "kissing lesions" at the anterior ankles. (AR 353.)

In November 2000, Plaintiff was re-evaluated by Dr. Ayson because she of pain while standing as well as ankle sprains following minimal activity. Dr. Ayson found that Plaintiff was depressed, and that this aggravated her fibromyalgia. Dr. Ayson found physical findings of pain with range of motion of the ankles and absence of range of motion of the subtalar joints. Dr. Ayson assessed Plaintiff's condition as one of degenerative change, impingement syndrome, and lateral ankle instability. (AR 184.)

On February 15, 2001, Plaintiff ceased working. (AR 358.) On February 20, 2001, Plaintiff underwent an anterior medial and lateral ankle arthroplasty[4] and lateral stabilization procedure on her left ankle. (AR 508.) Plaintiff was then approved for Short Term Disability under the Group Plan, and the benefits entitlements became effective on March 3, 2001. (AR 610.)

On July 27, 2001, Plaintiff underwent anterior ankle arthroplasty and ankle stabilization with repair of the anterior talar fibular and calcaneal ligaments on the right ankle. (AR 496.) On November 26, 2001, Plaintiff again had surgery on her left ankle. (AR 411.)

In early 2002, Plaintiff was awarded Social Security disability benefits. (AR 302.) Later, in May of 2002, Plaintiff moved to Pennsylvania to allow her sister to assist the Plaintiff with her daily activities. (AR 114.)

On or about July 9, 2002, while residing with her sister, Plaintiff saw Dr. Alan Kivitz, a board certified Rheumatologist. Dr. Kivitz agreed with the diagnosis of fibromyalgia in addition to unrelated problems of osteoarthritis of the knees and ankles. He agreed with the treatment Plaintiff was receiving, noting that antidepressants, muscle relaxers, and anti-inflammatories are all agents that are currently in use and typically indicated with Plaintiff's fibromyalgia. (AR 476.)

On July 25, 2002, Plaintiff saw Dr. Nancy Flaugh, a primary care physician, while in Pennsylvania. Dr. Flaugh completed a Physical Capacities Evaluation form and an Attending Physicians Statement. He stated that Plaintiff could sit for only 10 minutes at a time; could stand no more than 5 minutes at a time; could only walk 20 feet; and could only drive 15 to 20 miles without stopping and getting out. Additionally, Dr. Flaugh stated that Plaintiff had no lifting, carrying, or pushing/pulling capacity. He repeated the same restrictions in September of 2002. (AR 73.)

By June of 2003, Plaintiff had X-rays showing that she had exostosis[5] of the dorsum of the first metatarsal and cuneiform joint of the left foot. These difficulties were thought to be due to her lack of motion in the ankle joint. Also in June of 2003, Plaintiff began using a wheelchair.

---

**4.** "Arthroplasty" is an operation to "restore as far as possible the integrity and functional power of a joint." See *PDR Medical Dictionary 150* (1st ed.1995).

**5.** "Exostosis" refers to "a cartilage-capped bony projection arising from any bone that develops from cartilage." See *PDR Medical Dictionary 610* (1st ed.1995).

(AR 403.) The record indicates that Plaintiff utilizes several different modalities to assist her in her daily activities. She sometimes uses a wheelchair, crutches, and a walker. (AR 87.)

On July 29, 2003, Dr. Ayson initially completed a Physical Capacities Evaluation form. It stated that Plaintiff could sit for 8 hours at a time; could not stand; could not walk; and could only drive an hour without stopping and getting out of the vehicle. Additionally, Dr. Ayson stated that Plaintiff could occasionally lift and carry 10 pounds and could occasionally push/pull 10 pounds. However, she could never climb, balance, stoop, kneel, crouch, crawl, or reach below or above her shoulders. (AR 341.) Later, Dr. Ayson wrote a letter in support of Plaintiff's appeal stating that her condition had worsened. (AR 300.)

In August of 2003, Plaintiff presented to Dr. Jason Pleimann, an orthopedic surgeon, for an evaluation. He found that Plaintiff's condition deteriorated following her bilateral surgeries. He stated that she had daily pain and limited range of motion of the ankles, worse on the right ankle. He obtained X-rays that showed advanced osteoarthritis on the left with osteoarthritis and talar tilt on the right. An eventual ankle arthrodesis or total ankle replacement was discussed. (AR 350.)

On October 10, 2003, Defendant sent correspondence to Dr. Pleimann requesting his signature if he believed that Plaintiff could perform a sedentary occupation on a full-time basis. Dr. Pleimann provided his signature on November 12, 2003, indicating his opinion that Plaintiff could perform a sedentary occupation. (AR 339.) However, Dr. Pleimann later directed correspondence in support of Plaintiff's appeal stating that she could not perform a sedentary occupation due to swelling with a dependent position of the feet. (AR 301.)

On November 21, 2003, Defendant completed an Employability Analysis Report on Plaintiff. Defendant searched the 12,-741 occupations classified by the U.S. Department of Labor in the 1991 Dictionary of Occupational Titles (DOT) and selected five as being appropriate for the Plaintiff, after consideration of her education, work history and limitations. Of these five, one occupation was at the "Good" level, three were at the "Fair" level, and one was at the "Potential" level. These were chosen by using the restrictions given by Dr. Ayson on July 29, 2003, and Dr. Pleimann's report of November 12, 2003, but did not consider the restrictions of Dr. Flaugh in his report of on July 25, 2002. (AR 313.)

On February 2, 2004, Dr. Pleimann wrote a report in direct contradiction to his November 12, 2003, letter where he indicated Plaintiff could perform a sedentary job. The February 2, 2004 letter supported Plaintiff's appeal from her first denial of benefits, stating that she had significant arthritis in both ankles that made it impossible for her to spend a large amount of time on her feet. Dr. Pleimann also stated Plaintiff had swelling with a dependent position of the feet and, therefore, he believed it would be unlikely that Plaintiff would be able to do a sitting job for eight hours. (AR 301.)

On February 13, 2004, Dr. Ayson drafted correspondence supporting Plaintiff's appeal from her first denial of benefits, stating that Plaintiff continued to have problems, which would ultimately lead to fusions or joint replacements. She also stated that since June of 2000, Plaintiff's condition continued to worsen at a progressive rate. Dr. Ayson stated that Plaintiff would be unable to perform the duties required of her job, or any other job. Dr. Ayson found that in her opinion Plaintiff would never have improvement,

surgical or non-surgical, that would allow her to hold a job position. (AR 300.)

An independent reviewing physician, Dr. Andrea Wagner, Board Certified in Physiatry [6], was retained to assess and review the record and make a determination of Plaintiff's disability on behalf of Defendant. On March 16, 2005, and March 17, 2005, Dr. Wagner contacted Dr. Pleimann's office but was informed that Dr. Pleimann could not confer with her. Dr. Wagner also contacted Dr. Ayson's office on March 16, 2004, but was informed that Dr. Ayson was unavailable. (AR 189.) After reviewing the records, Dr. Wagner concluded that Dr. Ayson did not provide any explanation of how Plaintiff's foot and ankle conditions would impact her capacity for performing sedentary duties. Dr. Wagner further noted that while Dr. Pleimann provided in his letter that Plaintiff would not be able to sustain eight hours sitting with her feet in a dependent position, Dr. Pleimann did not provide any information to suggest why he changed his opinion of sedentary capacity as previously expressed on October 10, 2003. Dr. Wagner concluded that Plaintiff should be able to perform sedentary work with flexibility of the position changes. (AR 190–191.)

Defendant's Group Disability Plan provided for payments of 60% of an employee's monthly salary, subject to a maximum of $10,000, during the time the employee was determined to be totally disabled as defined by the policy. By entering into the insurance contract, Wal–Mart conferred upon Defendant "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy." (AR 15.) The Group Plan defines "total disability" as follows: during the "elimination period" and for the following twelve months, the insured is prevented "from performing the essential duties of [the insured's *specific* ] occupation." After the expiration of the elimination period (defined by the Group Plan as "the first 6 months of any one period of total disability") and the subsequent twelve months, the Group Plan's standard for total disability becomes substantially higher, elevating to require that the insured be prevented from performing the essential duties of "any occupation." (AR 15.) Plaintiff applied for Long–Term Disability Benefits (hereinafter "LTD Benefits") under her "own occupation," and they were granted on August 15, 2001. (AR 578.) However, Plaintiff was denied LTD Benefits on December 11, 2003, under the "any occupation" standard. (AR 309.) She appealed this decision and was again denied LTD Benefits on March 25, 2004. (AR 193.) Plaintiff exhausted her administrative remedies and filed the instant action.

**B. Standard of Review**

▮ The Employee Retirement Income Security Act of 1974 (ERISA) affords a plan beneficiary the right to a judicial review of a benefits determination. *See* 29 U.S.C. § 1132(a)(1)(B). Such cases are not to be determined under the standard for granting summary judgment pursuant to Federal Rule of Civil Procedure 56(c). *See Wilkins v. Baptist Healthcare System, Inc.,* 150 F.3d 609, 619 (6th Cir. 1998). The court must decide whether benefits were properly denied based on a review of the record presented to the administrator under the appropriate standard. *See id.* Accordingly, the plan administrator's decision to deny benefits must be upheld if "reasonable; *i.e.,* supported by substantial evidence." *See Do-*

---

**6.** "Physiatry" also means "physical medicine". See *PDR Medical Dictionary 1362* (1st ed.1995).

*naho v. FMC Corp.*, 74 F.3d 894, 899 (8th Cir.1996). Further, if supported by substantial evidence, such a denial "should not be disturbed even if a different, reasonable interpretation could have been made." *See Cash v. Wal–Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir.1997). Where a benefits plan allows the administrator discretionary authority to determine eligibility for benefits or to construe the plan, the court reviews the plan administrator's decision only for an abuse of discretion. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *Layes v. Mead Corp.*, 132 F.3d 1246, 1250 (8th Cir.1998). In the present case, Plaintiff acknowledges the LTD Plan gives the [Hartford Review Board] discretionary authority to administer, apply, and interpret the plan. (Doc. 8 p. 2.) Thus, we review the plan administrator's decision for an abuse of discretion.

### C. Discussion

■ In denying Plaintiff's request for continued LTD benefits, Plaintiff contends Defendant placed undue emphasis on the medical opinion of a non-attending physician and disregarded the opinions of Plaintiff's treating physicians. Plaintiff also contends that Defendant refused to consider Plaintiff's inability to perform a regular or consistent work schedule. Defendant states the plan administrator's decision to deny LTD benefits was proper, since Plaintiff's condition did not meet the definition of total disability under the "any occupation" standard as construed by it and by the independent reviewing physician.

Plaintiff argues Defendant relied essentially on the independent reviewing physician's opinion and afforded it more deference than that of Plaintiff's treating physicians. In support of this contention, Plaintiff relies on *Donaho v. FMC Corp.*, 74 F.3d 894, 901 (8th Cir.1996), which states that less deference should be af-

forded to a reviewing physician who has never examined the patient than that of treating physicians. Defendant refutes this standard and cites *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003), which it says, "conclusively held that the Social Security disability concept of favoring the treating physician's opinion has no place in ERISA analysis." (Doc. 9.) The Court notes the case reflected that, while "courts have no warrant to require administrators automatically to accord special weight to the opinions of the claimant's physician," plan administrators may not "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 1967.

While Dr. Ayson and Dr. Pleimann, two of Plaintiff's treating physicians, initially held that Plaintiff could perform a sedentary job, Plaintiff's condition worsened. Both doctors later wrote letters in support of Plaintiff's appeal for long-term disability benefits. (AR 300–301.) Dr. Ayson's letter indicated that Plaintiff's condition had worsened at a progressive rate and that Plaintiff would be unable to perform the duties required of her job, or any other job. (AR 300.) Dr. Pleimann's letter indicated that Plaintiff had significant arthritis in both ankles making it impossible for her to spend a large amount of time on her feet, and that she had swelling with a dependent position of the feet making it unlikely that Plaintiff would be able to sit for eight hours at a job. (AR 301.)

In addition to the two letters from her physicians in support of her disability, she was also seen by a primary care physician in Pennsylvania, who issued a Physical Capacities Evaluation and Attending Physician Statement which stated Plaintiff would only be able to sit for 10 minutes at a time. (AR 73.)

Dr. Wagner, the independent reviewing physician, reviewed the records of Plaintiff's physicians, and also the letters in support of Plaintiff's appeal. Dr. Wagner concluded that Dr. Ayson did not provide any explanation of how Plaintiff's foot and ankle conditions would impact her capacity for performing sedentary duties. She also found that Dr. Pleimann's letter failed to provide any information to suggest that he had changed his opinion of sedentary capacity. However, Dr. Wagner made no mention of the statement of Dr. Ayson that Plaintiff's condition was worsening and that Plaintiff would require further surgeries consisting of fusions or joint replacements. (AR 300.) Dr. Wagner also made no mention that Dr. Pleimann supported his change from his initial diagnosis by stating that Plaintiff had swelling with a dependent position of the feet, and it would be unlikely that she could sit for 8 hours. (AR 300.)

The Court finds that while the plan administrator is not automatically required to accord deference to the treating physicians, the plan administrator failed to consider Plaintiff's reliable evidence from her treating physicians' opinions by relying solely on one independent reviewing physician's opinion.

Defendant contends Plaintiff's treating physicians did not sufficiently address why Plaintiff could not perform a sedentary occupation. The Plaintiff counters that the ultimate inquiry is, however, whether Plaintiff *is* disabled, not *why* she is disabled. *See Utley v. Sullivan, M.D.*, 943 F.2d 19, 21 (8th Cir.1991). Defendant states that the circumstances raise a reasonable inference that Plaintiff's treating physicians did not want to impede any chance of a former patient receiving LTD benefits.

We find the Defendant's contentions without merit and the Plaintiff's arguments persuasive. The ultimate inquiry must be based on whether Plaintiff is disabled, not why she is disabled. *Id.* The administrative record provides overwhelming evidence to support that Plaintiff was disabled as defined by the policy. The Court can only conclude that Defendant's decision was not based upon substantial evidence, and consequently arbitrary, and an abuse of discretion.

Plaintiff's complications started as a child, when she had a bilateral triple arthrodeses procedure, to fuse three bones in a foot or feet together. (AR 353.) Plaintiff later developed osteoarthritis due to the procedure she had undergone as a child. Plaintiff was also diagnosed with fibromyalgia. (AR 183.) Although Plaintiff had some improvement, she eventually underwent three surgeries on her ankles. These consisted of two surgeries to her left ankle and one to the right. (AR 411, 508.) Plaintiff moved to Pennsylvania to obtain her sister's help with Plaintiff's daily activities. (AR 114.) Moreover, Plaintiff is in constant need of a wheelchair, crutches, or a walker to enable her to function. (AR 87.)

Plaintiff began receiving Social Security benefits due to her disability on February 11, 2004. (AR 302.) Although the Social Security Administrator's determination is not binding on this Court, it is relevant admissible evidence to support an ERISA claim for long-term disability benefits. *See Riedl v. General American Life Insurance Company*, 248 F.3d 753, 759 n. 4 (8th Cir.2001); *Duffie v. Deere & Co.*, 111 F.3d 70, 74 n. 5 (8th Cir.1997).

All of Plaintiff's physicians restricted her standing ability, and as her condition deteriorated Dr. Pleimann restricted her sitting ability because of swelling in certain positions of the feet. (AR 301.) Dr. Ayson stated Plaintiff could not perform the duties of any job, because Plaintiff's condition would continue to require surgeries

and would never improve. (AR 300.) Applying the abuse of discretion standard in ERISA matters, the Court must determine whether a reasonable person could arrive at the same conclusion as the plan administrator. *See House v. Paul Revere Life Ins. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001). The Court finds that based on the facts set out above, a reasonable person could not arrive at the same conclusion; therefore, it was an abuse of discretion by the plan administrator to deny Plaintiff LTD benefits.

Finally, Plaintiff contends that Defendant improperly relied on an Employability Analysis. Utilizing this procedure, Defendant entered restrictions into a computer program that searches 12,741 occupations classified by the U.S. Department of Labor in the 1991 DOT. Of these 12,741 occupations, Defendant selected five that it believed Plaintiff had the capacity to perform. Of these five, one occupation was at the "Good" level, three were at the "Fair" level, and one was at the "Potential" level. (AR 313.) Plaintiff argues that the Defendant failed to take into account that Plaintiff could not perform a regular or consistent work schedule, her condition was worsening and she would continue to have surgeries. Defendant argues that there is substantial evidence that Plaintiff could work a sedentary job as long as she could sit all day and shift posture. The Court notes that the Employability Analysis was based on restrictions that Defendant chose, and did not include the restrictions of all of the Plaintiff's treating physicians which, *inter alia,* emphasized a worsening condition.

Defendant contends Plaintiff could work a sedentary job as long as she could sit all day and shift posture, but the conclusion is contrary to the attending physician's limitations. Moreover, the Court finds that is highly unlikely Plaintiff could obtain one of the five of 12,741 occupations, while continuing to have surgeries, and being permitted to have her feet elevated often throughout the day.

Based on the foregoing, we determine that the plan administrator's decision was not supported by substantial evidence. Moreover, we determine the plan administrator's decision to deny benefits constituted an abuse of discretion as it unreasonably discounted the medical evidence contained in Plaintiff's application for benefits.

## D. Attorneys' Fees

■ A district court has discretion to award attorneys' fees under ERISA. *See Sheehan v. Guardian Life Ins. Co.*, 372 F.3d 962, 968 (8th Cir.2004); *Lawrence v. Westerhaus*, 749 F.2d 494, 494 (8th Cir. 1984).

■ "When considering whether to award such fees, the 8th Circuit has set forth general guidelines for district courts to follow, including the five factors set forth in *Westerhaus*." *Id.* These factors include:

(1) the degree of the opposing parties' culpability or bad faith;

(2) the ability of the opposing parties to satisfy an award of attorneys' fees;

(3) whether an award of attorneys' fees against the opposing parties could deter other persons acting under similar circumstances;

(4) whether the parties requesting attorneys' fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question [sic] regarding ERISA itself; and

(5) the relative merits of the parties' positions.

*Westerhaus*, 749 F.2d at 496 (alteration in original); *Sheehan*, 372 F.3d at 968.

■ Reviewing the relevant considerations, this Court finds that Plaintiff is entitled to fees and costs. First, the Plan Administrator's decision was a clear abuse of discretion. Second, there is noting before the Court to indicate that Defendant would be unable to pay fees and costs. Third, the award in this instance would help deter such abuse of discretion in the future. Fourth, by example, Plaintiff's action benefits all Group Plan participants by providing judicial interpretation of "total disability" under the policy. Finally, the relative merits of the case clearly favor the Plaintiff. Accordingly, Plaintiff is entitled to attorneys' fees and costs, and Plaintiff is directed to submit to the Court a proposal for reasonable attorneys' fees and costs.

### E. Prejudgment Interest

■ "Prejudgment interest awards are permitted under ERISA where necessary to afford the Plaintiff 'other appropriate equitable relief' under section 1132(a)(3)(B)." *Kerr v. Charles F. Vatterott & Co.*, 184 F.3d 938, 945 (8th Cir.1999). One purpose of the remedy is to compensate the prevailing part for financial damages incurred. *Id.* At 946. Another important purpose is to "promote settlement and deter attempts to benefit unfairly from the inherent delays of litigation." *Stroh Container Co. v. Delphi Indus., Inc.*, 783 F.2d 743, 752 (8th Cir.), *cert. denied*, 476 U.S. 1141, 106 S.Ct. 2249, 90 L.Ed.2d 695(1986). "A common thread throughout the prejudgment interest cases is unjust enrichment-the wrongdoer should not be allowed to use the withheld benefits or retain interest earned on the funds during the time of the dispute." *Kerr*, 184 F.3d at 946. Based on these considerations Plaintiff should be awarded prejudgment interest to make her whole, and to promote settlement on behalf of the Defendant. Finally, Plaintiff would not be unjustly enriched by such an award. Accordingly, Plaintiff is entitled to prejudg-

ment interest. The Court relies on 28 U.S.C. § 1961 to determine the appropriate rate of interest. *See Sheehan, supra.* Plaintiff is awarded prejudgment interest at a rate of 3.39 percent compounded annually from September 1, 2002 to the date of this judgment.

### F. Post-judgment Interest

■ Under 28 U.S.C. § 1961, district courts are required to award post-judgement interest. The statute provides that "[such] interest shall be calculated from the date of the entry of judgment," and "shall be computed daily to the date of payment." 28 U.S.C. § 1961(a), (b). The statute "mandates the imposition of post-judgment interest, thus removing the award of such interest from the discretion of the District Court." *Bricklayers' Pension Trust Fund v. Taiariol*, 671 F.2d 988, 989 (6th Cir.1982). The federal post-judgment interest statute allows interest on "all money judgments," including those in ERISA cases. *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 810 (6th Cir.2002). Moreover, Plaintiff is entitled to post-judgment interest on this Court's award of prejudgment interest. See *Caffey v. UNUM Life Ins. Co.*, 302 F.3d 576, 586 (6th Cir.2002).

### G. Conclusion

Based on the foregoing reasons, Plaintiff is entitled to a judgment against Defendant, Defendant's decision to deny benefits is REVERSED, and this case is remanded to the plan administrator for a benefits determination that is consistent with this opinion.